IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| WILLIAM G. SCOTT, | ) | CASE NO.  1:22-cv-01585 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| v. | ) | |
| | ) | |
| PRESRITE CORPORATION, *et al.*, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendants. | ) | |
| | ) | |

Before the Court is Defendants' motion for summary judgment.  (Doc. No. 41.)  Scott

opposed the motion (Doc. No. 42) and Defendants replied (Doc. No. 39).  After review of the

parties' submissions and the factual record before the Court, Defendants' motion for summary

judgment is DENIED.

I.      **Factual Background**

        Presrite Corporation ("Presrite") hired William Scott ("Scott") in 1988.  (Doc. No. 42,

PageID #670.)  Since then, Scott held numerous positions throughout his nearly thirty-four

career at Presrite.  (Doc. No. 41-1, PageID #588.)  Initially, Scott held roles as a production

helper, a time press operator, a junior draftsman, and a die designer.  (Doc. No. 42, PageID

#671.)  He rose to the ranks of management in 2005.  (*Id.*)  In 2010, Presrite promoted Scott to

technical support manager, and, in 2018, Presrite promoted Scott again to technical sales

director.  (*Id.*)  In these capacities, Scott worked with several colleagues.  Among them were

Chris Carman, the CEO of Presrite ("Carman"); Gary Davis, the President of Presrite ("Davis");

Marci Vinyard, a Senior Vice President ("Vinyard"); and Matthew May, the Director of Human

Resources ("May").  (Doc. No. 41-1, PageID #588.)  By all accounts, Scott was a well-liked employee.  (Doc. No. 42, PageID #671–72.)

The events leading to this lawsuit began in 2019.  At that time, Scott alleges—and testified—that he started noticing certain actions that would later form the bases of his reports of discrimination.  (*Id.* at PageID #672.)  For instance, Scott alleges that in 2019, Presrite started terminating employees who were older or disabled.  (*Id.*)  Scott identified eight employees that he claims were terminated due to age or disability.  (*Id.* at PageID #674.)  Scott also claims that he began hearing from several lower-level employees that they were fearful to seek medical care because they might be terminated for incurring costs to Presrite.  (*Id.* at PageID #673; Doc. No. 41-2, PageID #636.)  In his deposition, Scott identified by name a few employees who were specifically afraid to seek medical care.  (Doc. No. 42, PageID #674.)  During this time, Scott testified that at Presrite staff meetings, the first issue routinely addressed was how to lower medical expenses Presrite was paying for employees.  (Doc. No. 42-1, PageID #743.)

Lastly, Scott identified a few specific instances where he thought Presrite engaged in age or disability discrimination.  Scott pointed to the termination of an employee, T.B., and the failure to hire a prospective employee, K.B., as evidence of Presrite's pattern of discrimination.  (Doc. No. 42, PageID #674.)  In 2019, Scott was T.B.'s supervisor.  (Doc. No. 41-1, PageID #589.)  At that time, Carman and Davis discussed terminating T.B.  (*Id.*)  T.B.'s sales were the lowest of all salespeople and T.B. was the only employee located in Texas (requiring Presrite to pay for leasing space for a single employee there).  (*Id.*)  Together with poor economic conditions, Presrite informed Scott that it planned to terminate T.B.  (*Id.* at PageID #590.)  During these discussions, Scott informed Presrite that T.B. was experiencing medical issues.  (*Id.*)  According to Scott, Presrite then decided not to terminate T.B.  (*Id.*)  However, after

eighteen months, in the spring of 2021, Presrite decided to follow through with T.B.'s termination.  (*Id.*)  Presrite instructed Scott to terminate T.B., providing Scott with a script.  (*Id.*)  Scott did not object to T.B.'s termination other than potentially lodging general objections to T.B.'s termination because Scott felt that T.B. was still a utility to Presrite.  (*Id.* at PageID #590–91.)  Now, Scott claims that T.B.'s termination was part of Presrite's pattern of discriminating against the elderly and disabled.  (Doc. No. 42, PageID #673.)

K.B. was a former Presrite employee.  (Doc. No. 39, PageID #572.)  When an estimator position became available, Scott suggested to his supervisor, Vinyard, that Presrite should rehire K.B. because of his vast experience in the field.  (*Id.*; Doc. No. 42-1, PageID #734–35.)  At that time, K.B. was close to retirement age.  (Doc. No. 42-1, PageID #740.)  Vinyard did not agree with Scott's recommendation, stating in an email, "I strongly believe we need fresh blood in the Estimating department, along with fresh ideas from the existing department, in order to meet the goals we have set for the next year."  (Doc. No. 42-5, PageID #809.)  Scott apparently interpreted this to mean that Presrite did not want to hire K.B. due to his age.  (Doc. No. 42, PageID #673–74.)

For its part, Presrite disagrees with Scott's interpretation of the alleged discriminatory actions.  First, beginning in 2019—the time when Scott began noticing the alleged age and disability discrimination—Presrite was experiencing turbulent economic conditions.  (Doc. No 41-1, PageID #589.)  Thus, Presrite claims that these layoffs—and others—were part of a larger effort to reduce costs due to economic conditions.  (*Id.*)  Presrite argues that this is the only reason it terminated some employees and refutes that the employees were terminated for discriminatory reasons.  As it relates to T.B., Presrite explains that T.B. was simply terminated for economic reasons.  (*Id.* at PageID #589–90.)  He was the sole employee in his area and had

low sale volumes.  (*Id.*)  Presrite already contemplated terminated T.B. for those exact reasons.  (*Id.*)  Accordingly, Presrite claims that it did not terminate T.B. for any reason relating to age or disability.

Similarly, Presrite's decision to not rehire K.B., in its view, was not discriminatory.  K.B. did not hold an engineering degree and, due to his age, would not be expected to seek a promotion into a technical sales manager role.  (Doc. No. 39, PageID #572–73.)  At the time of the decision to not rehire K.B., Presrite's policy was to hire individuals that held an engineering degree, something that Scott himself proposed.  (Doc. No. 42-5, PageID #809.)  Accordingly, Presrite argues that the decision to not rehire K.B. was not based on his age.

It is undisputed that Scott did not report any of these concerns to his supervisors at Presrite prior to July 2021.[1]  Instead, Scott privately held these beliefs.  That changed in July 2021.  The facts relating to July 2021 transpired as follows.

In mid-2021, Presrite worked on bringing employees back to the office following a transition to work-from-home spurred by the COVID-19 pandemic.  (Doc. No. 41-1, PageID #591.)  Presrite wanted all managers back in the office five days a week.  (*Id.* at PageID #591–92.)  Among the employees that Presrite wanted back in the office was M.F., a manager who reported to Scott.  (*Id.* at PageID #591.)  However, M.F. recently experienced significant health issues and wanted to remain working from home.  (*Id.*)  On or about July 12, 2021, Scott, May, and Vinyard discussed options to accommodate M.F.'s request.  (*Id.* at PageID #592; Doc. No. 42, PageID #675.)  Scott and M.F. eventually proposed an accommodation where Presrite could transition M.F. into a non-managerial role and M.F. could continue to work from home.  (Doc.

---

[1] Scott alleges that he told one of his supervisors about discrimination in 2019.  (Doc. No. 41-1, PageID #591.)  In his summary judgment papers, Scott does not argue that this was protected activity.  Accordingly, the Court will not address whether these communications are sufficient.

No. 41-1, PageID #592.) All parties agreed with the transition. (Doc. No. 41-2, PageID #624–25.)

After the parties agreed to the job change, May requested that Scott provide an updated job description for M.F. (Doc. No. 42, PageID #675; Doc. No. 41-1, PageID #592.) Scott agreed to do so. (Doc. No. 41-1, PageID #592.) In a follow-up meeting between Scott, May, and Vinyard on or about the next day, Scott testified that May also requested a list of the things M.F. was doing over the last two years. (Doc. No. 41-2, PageID #625.) From this, Scott "had the clear impression that May and Vinyard wanted him to create a 'paper trail' about [M.F.]" to set him up for termination. (Doc. No. 42, PageID #675.) Scott did not immediately tell anyone this, but instead, on July 15, 2021, told May that he was "still working on" updating the job description. (Doc No. 41-1, PageID #592.)

On July 14, 2021, Scott and Vinyard discussed a customer issue. (*Id.* at PageID #592–93.) The discussions grew contentious. (*Id.*) Scott was angry and critical of his coworkers, stating in an email that "[t]he people involved have no idea what they're talking about." (Doc. No. 41-2, PageID #629.) The following day, on July 15, 2021, Vinyard and Scott discussed, through a series of emails, further issues with Scott's job performance, including his attendance in the office. (Doc. No. 41-1, PageID #593.) In the evening, Vinyard emailed Scott that his attitude "sounds dangerously like insubordination" and that the two would need to discuss further the next day. (*Id.*) At some point that evening, Vinyard called Scott. (Doc. No. 41-2, PageID #629.) During that call, Vinyard and Scott discussed the customer issue and Scott "brought up to her about the people being let go." (*Id.* at PageID #629–30.) After that call, Vinyard emailed Scott a lengthy follow-up where she indicated that Scott needed to improve as an employee. (*Id.* at PageID #631.) Scott testified that Vinyard's email was "wrong on all of it."

(*Id.* at PageID #631–32.)

Later that evening, on July 15, 2021, Scott emailed Carman and Donald Diemer (Presrite's 91-year-old former CEO) asking for a meeting the next morning.  (Doc. No. 42, PageID #676; Doc. No.41-1, PageID #593–94.)  He explained that he wanted to discuss an issue that had "moral implications."  (Doc. No. 42, PageID #676; Doc. No. 41-1, PageID #593–94.)  Early the next morning, on July 16, 2021, Scott and Carman held a phone call.  (Doc. No. 41-2, PageID #634.)  During that call, Scott and Carman discussed Scott's impression that he was being set up to make a paper trail on M.F. to set him up for termination.  (*Id.*)  M.F. was the only individual discussed during the brief conversation between Scott and Carman.  (*Id.*)  Following that call, Carman called Davis and told him to investigate Scott's allegation that Presrite was trying to set up M.F. for termination and that Presrite was firing people due to age and illness.  (Doc. No. 42-4, PageID #772–76, 780.)  When May and Vinyard arrived at the office that day, Davis held an in-person meeting with them to determine the veracity of Scott's allegations.  (*Id.* at PageID #776.)  May and Vinyard told Davis that there was no truth to the allegation.  (*Id.*)  Davis testified that at that point, he thought Scott was being dishonest about Presrite terminating employees because of illness or age.  (*Id.* at PageID #777.)

Following that meeting, Davis testified that he had an in-person meeting with Carman and May.  (*Id.* at PageID #780–81.)  May, however, testified that he did not recall a second meeting between himself and Davis.  (Doc. No. 42-2, PageID #752.)  At that meeting, Carman reiterated what Scott had told him—that Scott thought Presrite was creating a paper trail to terminate M.F. and that Scott thought Presrite was discriminating based on age and illness.  (Doc. No. 42-4, PageID #780.)  Davis testified that the three specifically discussed M.F., but did not discuss Scott's general allegation because it was "not true."  (*Id.* at PageID #781.)  The

parties agreed that there was no truth to Scott's allegation relating to M.F. and that Presrite did not want to terminate him.  (*Id.*)  During this meeting, Davis testified that he thought Scott needed to be terminated because of the untruthful allegations he was making with respect to M.F., other employees, and discrimination generally.  (*Id.* at PageID #782.)

After the above discussion, and before his termination, May and Vinyard sat down with Scott on July 16, 2021.  (Doc. No. 41-1, PageID #594; Doc. No. 42, PageID #677.)  At this point, Davis testified that the decision to terminate Scott was already made.  (Doc. No. 42-4, PageID #782.)  However, May did not have that same understanding.  May testified that the decision to terminate Scott occurred after the July 16, 2021 meeting between himself, Vinyard, and Scott.  (Doc. No. 42-2, PageID #752.)  And Davis later testified that a "final decision" was not made until after the July 16, 2021 meeting between Scott, May, and Vinyard.  (Doc. No. 42-4, PageID #797.)  Regardless, during this meeting, Scott reaffirmed that he thought he was being set up to let M.F. go.  (Doc. No. 42, PageID #677.)  The three also discussed some of Scott's recent job performance, behavior, and attitude towards workers.  (Doc. No. 41-1, PageID #594; Doc. No. 41-2, PageID #635.)  Scott openly criticized his direct superior, Vinyard, by stating that he was doing his job well and that she was not.  (Doc. No. 41-2, PageID #635.)  Scott, in an affidavit submitted with the opposition to summary judgment, stated that during this meeting he informed May and Vinyard that he had legal representation.  (Doc. No. 42-6, PageID #822.)  May testified that he did not hear Scott state that he had legal representation.  (Doc. No. 41-1, PageID #595.)  The meeting ended after Scott reported that he was not feeling well. (Doc. No. 41-1, PageID #594; Doc. No. 42, PageID #677.)  Scott left for the parking lot, and while sitting in his car, sent an email to Carman, May, Vinyard, and Davis stating that he is "afraid of retaliation based on whistleblower status . . . ."  (Doc. No. 41-2, PageID #636.)

Immediately after the meeting, May and Vinyard reported back to Davis.  (Doc. No. 42-4, PageID #789.)  Davis testified that May and Vinyard stated the meeting did not go well and that Scott doubled down on his accusations and included additional accusations of unlawful practices.  (*Id.* at PageID #790–91.)  After this discussion, Davis stated that he made the final decision to terminate Scott's employment.  (*Id.* at PageID #797.)  At this point, May and Vinyard testified that Davis stated Scott should be terminated and they agreed.  (Doc. No. 42-2, PageID #752; Doc. No. 42-5, PageID #814.)

The following Monday, July 19, 2021, Scott, May, and Vinyard held another meeting.  (Doc. No. 41-1, PageID #595; Doc. No. 42, PageID #678.)  May and Vinyard terminated Scott's employment at that meeting.  (Doc. No. 41-1, PageID #596; Doc. No. 42, PageID #678.)  The reason stated for Scott's termination was per-written before the meeting, which was read to him.  (Doc. No. 42, PageID #682.)  The reason provided was "his being dishonest about information of [M.F.] to executive management, that we lost faith in his trust and leadership."  (*Id.*)

## II.  <u>Procedural History</u>

From the above facts, Scott filed the instant lawsuit.  (Doc. No. 1.)  After amending the original complaint, Scott alleges the following causes of action: (1) retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(d); (2) retaliation under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12203(a); (3) retaliation under Ohio law, R.C. 4112.02(I); (4) aiding and abetting retaliation under Ohio law, R.C. 4112.02(J); and (5) wrongful discharge in violation of Ohio public policy.  (Doc. No. 24.)  Scott asserts Counts I–III and V against Presrite and Count IV against Davis, May, Vinyard, and Carman in their individual capacity.  (*Id.*)

After discovery, Presrite—along with Davis, May, Vinyard, and Carman—moved for

summary judgment on all claims.  (Doc. No. 41.)

## III.   Law and Analysis

### A.   Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mining Mach., Inc. v. Copley*, 145 F. App'x 149, 152 (6th Cir. 2005) ("The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact.").

A "material" fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact."  *Queen v. City of Bowling Green, Kentucky*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins.*

*Co.*, 395 F.3d 338, 342 (6th Cir. 2005).

A party asserting or disputing a fact must cite evidence in the record or show that the record establishes either the absence or the presence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c), (e).  Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs.  Fed. R. Civ. P. 56(c)(3); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation omitted).  However, the Court's role is not to make credibility determinations or weigh conflicting evidence.  *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003).  "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law."  *Payne*, 767 F.3d at 530.

## B.    The Retaliation Claims Under the ADEA, ADA, and Ohio Law

Counts I through III allege that Presrite retaliated against Scott by terminating him after Scott reported concerns of discrimination based on age and disability.  (Doc. No. 24.)  Presrite argues that none of Scott's retaliation claims are viable.

The ADEA makes it unlawful for an employer to "discriminate against any of his employees . . . because [he] has opposed any practice made an unlawful employment practice by this section . . . ."  29 U.S.C. § 623(d).  Similarly, the ADA makes it unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful by

this chapter . . . ."  42 U.S.C. § 12203(a)).  And Ohio law makes it "an unlawful . . . [f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice . . . ."  *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007) (quoting R.C. 4112.02(I)).

When a plaintiff alleges circumstantial evidence of retaliation, as here,[2] courts apply the same legal standard when assessing claims arising under any of these statutes—the framework discussed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981).  *See Spengler v. Worthington Cylinders*, 615 F.3d 481, 491–92 (6th Cir. 2010) (applying *McDonnell Douglas/Burdine* framework to ADEA retaliation claim); *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (applying *McDonnell Douglas/Burdine* framework to ADA retaliation claim); *Greer-Burger*, 879 N.E.2d at 180 ("federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112" and applying *McDonnell Douglas/Burdine* framework to Ohio state law claim).  While the precise elements of each claim differ, the Court will use the *McDonnell Douglas/Burdine* framework applicable to each, noting differences to the extent necessary, and the Court will utilize case law examining the *McDonnell Douglas/Burdine* framework in other retaliatory contexts.

Under the *McDonnell Douglas/Burdine* framework, the plaintiff has the initial burden to establish a *prima facie* retaliation claim by showing: "(1) he engaged in protected activity when he made his age discrimination complaint; (2) Defendant knew about his exercise of the protected activity; (3) Defendant thereafter took adverse employment action against him; and (4)

---

[2] Plaintiff does not argue there is direct evidence in this case.

there was a causal connection between the protected activity and the adverse employment action." *Spengler*, 615 F.3d at 491–92 (citing *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007)).  If a plaintiff can meet this burden, "the burden of production shifts to Defendant to 'articulate some legitimate, nondiscriminatory reason for [its action].'" *Id.* at 492 (quoting *McDonnell Douglas*, 411 U.S. at 802).  If a defendant can articulate such a reason, the "burden shifts back to Plaintiff to demonstrate that Defendant's 'proffered reason was not the true reason for the employment decision.'" *Id.* (quoting *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007)).

Presrite argues that Scott has failed to establish a *prima facie* case relating to: (1) whether Scott engaged in a protected activity; (2) whether Presrite had actual knowledge of the protected activity; and (3) whether there is a causal connection between the protected activity and Scott's termination.  (Doc. No. 41-1, PageID #598–603.)  Presrite further argues that even if Scott could make a *prima facie* case of these elements, Presrite had legitimate, non-discriminatory reason for terminating Scott.  (*Id.* at PageID #603.)  Lastly, Presrite argues that Scott cannot demonstrate that the legitimate, non-discriminatory reasons were a pretext.  (*Id.* at PageID #603–04.)  Scott argues that he has met all the elements of a *prima facie* case of retaliation because he reported his reasonable concerns relating to discriminatory behavior resulting in his termination.  (Doc. No. 42, PageID #680–82).  Further, Scott argues that, even if Presrite's can allege a legitimate, non-discriminatory reason, Scott sufficiently showed that that reason was not the true reason he was terminated because his job was not at risk until the night before Presrite learned of the protective activity.  (*Id.* at PageID #682–83.)

1.      ***Prima Facie* Case of Retaliation**

a.      **Protected Activity**

Scott argues that he engaged in protected opposition activity in July 2021.[3] (Doc. No. 42, PageID #680.)  First, Scott argues that he engaged in opposition activity when he reported concerns about age and disability discrimination to Vinyard in the evening of July 15, 2021, including allegations that employees were fearful to seek medical care due to past instances of discrimination.  (*Id.*)  Second, Scott argues he engaged in opposition activity when he spoke with Carman in the morning of July 16, 2021 and reported his concerns that M.F. was potentially being discriminated against and concerns regarding discrimination on the basis of age and disability.  (*Id.* at PageID #676–77, 680.)  Lastly, Scott argues he engaged in opposition activity when he reiterated his concerns relating to discrimination to May and Vinyard during the July 16, 2021 meeting.  (*Id.* at PageID #677, 680.)  Together, Scott claims that he opposed the specific potential termination of M.F. and opposed more generally the discriminatory practices that led to employee beliefs that they could be adversely impacted if they sought medical care.  Presrite argues Scott did not engage in a protected activity for two reasons: (1) there was no

---

[3] The parties' briefing reveals a mismatch in precisely what opposition activity Scott is alleging he engaged in.  Because it is Scott who brings the claims, for purposes of summary judgment, the Court will rely on only those activities that Scott relies on in his opposition to summary judgment.  Thus, although Scott appears to reference other opposition activity in his amended complaint (*e.g.*, the termination of T.B.), the Court will only focus on the events of July 2021 because Scott only relies on those events for opposition activity.  In any event, it is undisputed that Scott did not engage in any opposition activity before the events of July 2021 because he did not report any claims to supervisors with decision-making authority.  (Doc. No. 39, PageID #574.)  As such, these instances cannot form the basis of protected activity.  *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (a plaintiff "must establish that he challenged an employment practice") (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000)).  However, the instances may inform whether Scott had a reasonable belief of unlawful activity.

reasonable basis for Scott to believe Presrite violated any laws; and (2) Scott did not actually engage in any opposition activity.[4]  (Doc. No. 41-1, PageID #599–600.)

The ADEA, ADA, and R.C. 4112 only protects parties from retaliation if the party engaged in "protected activity."  *See Spengler*, 615 F.3d at 491–92 (ADEA); *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (ADA); *Greer-Burger*, 879 N.E.2d at 180 (R.C. 4112).  The anti-retaliation laws generally prohibit retaliation based on either protected participation activity or protected opposition activity.  *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989) (explaining difference between Title VII's analogous "participation clause" and "opposition clause").  The anti-retaliation laws provide "exceptionally broad protection" for plaintiffs who engage in protected activity under the participation clause, which, for example, includes testifying in proceedings relating to discriminatory conduct.  *Id.* (quoting *Pettway v. Am. Cast Iron Pipe Co.*, 411 F.2d 998, 1006 (5th Cir. 1969)).

In contrast, "the opposition clause does not protect all opposition activity."  *Id.* (citation and quotation omitted).  Instead, courts have imposed limitations on what counts as protected opposition activity.  First, in the analogous Title VII context, the Sixth Circuit has explained that while "Title VII does not restrict the manner or means by which an employee may oppose unlawful employment practices . . . Title VII does not protect an employee . . . if his opposition is merely a 'vague charge of discrimination.'"  *Yazdian*, 793 F.3d at 645 (first quoting *Johnson*, 215 F.3d at 580; then quoting *Booker*, 879 F.2d at 1313).  "Although vague complaints do not

---

[4] Presrite recites the legal standard that opposition activity must be opposed in a reasonable manner.  (Doc. No. 41-1, PageID #599.)  However, Presrite does not offer further argument on this point.  In any event, the Court cannot find that Scott opposed the alleged discriminatory actions in an unreasonable manner as a matter of law.

constitute opposition, '*Booker* does not . . . require that the plaintiff's complaint be lodged with absolute formality, clarity, or precision.'" *Id.* (quoting *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013)). However, "[i]n order to engage in a protected opposition activity . . . a plaintiff must make an overt stand against suspected illegal discriminatory action." *Lockett v. Marsh USA, Inc.*, 354 F. App'x 984, 997 (6th Cir. 2009) (quoting *Coch v. Gem Indus., Inc.*, No. L–04–1357, 2005 WL 1414454, at *5 (Ohio Ct. App. June 17, 2005)). Second, "[t]he plaintiff also must express her opposition in a reasonable manner." *Jackson v. Genesee Cnty. Road Comm'n*, 999 F.3d 333, 345 (6th Cir. 2021) (citing *Johnson*, 215 F.3d at 580). Accordingly, "[a]n employee is not protected when he violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employer's goals." *Id.* (quoting *Booker*, 879 F.2d at 1312). Lastly, a plaintiff must have a "reasonable and good faith belief that the opposed practices were unlawful." *Id.* (quoting *Johnson*, 215 F.3d at 579).

With respect to a plaintiff's reasonable good faith belief, a plaintiff need not prove discrimination to succeed on a retaliation claim. *Yazdian*, 793 F.3d at 646. Instead, the Sixth Circuit explained that "[t]o come within the protection of Title VII," a plaintiff "must establish that he challenged an employment practice that he reasonably believed was unlawful." *Id.* at 645 (citing *Johnson*, 215 F.3d at 580). The Sixth Circuit explained:

> This requirement includes objective and subjective components: the employee complaining of [discriminatory practices] must "actually believe[] that the conduct complained of constituted a violation of relevant law," and "a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee" would believe that the conduct complained of was unlawful.

*Id.* at 646 (quoting *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015)). The inquiry is "necessarily fact-dependent." *Id.* (quoting *Rhinehimer*, 787 F.3d at 811). Thus,

the Sixth Circuit has instructed that "the issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts known to the employee amounted to a violation or otherwise justified the employee's belief that illegal conduct was occurring."  *Id.* (quoting *Rhinehimer*, 787 F.3d at 811).  "[T]he reasonableness of the employee's belief will depend on the totality of the circumstances known (or reasonably albeit mistakenly perceived) by the employee at the time of the complaint, analyzed in light of the employee's training and experience."  *Id.* (quoting *Rhinehimer*, 787 F.3d at 811).

Presrite's argues that Scott did not engage in protected activity because his belief of Presrite's alleged unlawful conduct was not objectively reasonable.[5]  (Doc. No. 41-1, PageID #600.)  Focusing on M.F., Presrite claims that no reasonable person could believe that it was discriminating against M.F.  (*Id.*)  Scott argues that, considering all of his experiences since 2019, his belief regarding discriminatory conduct was reasonable.  (Doc. No. 42, PageID #680–81.)

In a factually similar case, a court sitting in the Eastern District of Michigan denied a defendant employer summary judgment on a ADEA retaliation claim, specifically on the reasonable belief requirement.  *See Canning v. FCA US LLC*, No. 15-14390, 2017 WL 4918521, *5 (E.D. Mich. Oct. 31, 2017).  In *Canning*, plaintiff was a supervisor working for defendant.  *Id.* at *1.  As part of annual reviews of employees, defendant used a numbered rating system in which supervisors would assign their subordinates values which were reviewed by upper management.  *Id.*  Plaintiff assigned scores to her subordinates, but after a meeting with upper management, was instructed to lower one employee's score.  *Id.* at *2.  Plaintiff believed that the

---

[5] Presrite also argues that Scott's belief was not held in subjective good faith.  Presrite makes that argument within its causation arguments, and so the Court will address those arguments there.

lower score was due to age discrimination.  *Id.*  She reported these beliefs to her supervisors and refused to change the score.  *Id.* at *2–3.  Plaintiff then alleged she was subject to retaliation in several ways, including receiving lower scores on her own reviews.  *Id.* at *2.  On defendant's motion for summary judgment, defendant argued that plaintiff's belief of age discrimination was not objectively reasonable.  *Id.* at *5.  The court disagreed and denied defendant's motion.  *Id.* In so doing, the court relied on a number of facts, including: comments were made to plaintiff that could be construed as having a preference for younger employees; plaintiff's testimony that defendant had a practice of assigning lower scores systematically to older employees; plaintiff heard from other older employees that they felt they received lower scores because of their age; plaintiff believed certain employee scores were not reflective of actual performance; and plaintiff was instructed to include comments for employee scores that were not based in fact to justify lower scores for older employees.  *Id.* at *4.  While defendant offered evidence to refute these issues, the court found that, on summary judgment, it could not resolve those issues and that plaintiff need not actually prove discrimination.  *Id.* at *5.

Here, like *Canning* where the plaintiff believed the scores for employee reviews were based on age discrimination, Scott believed that the creation of the new job description, and additionally a rundown of work M.F. did over the last two years, was requested as a set up to terminate M.F.  (Doc. No. 41-2, PageID #634.)  Scott believed that Presrite was going to terminate M.F. because M.F. had a disability.  (*Id.*)  Like the plaintiff in *Canning*, Scott's belief was based on his prior experiences and observations at Presrite over the last few years.  (*Id.* at PageID #627.)  Specifically, Scott testified that he believed several employees between 2019 and 2021 were terminated because of their age or disability, and that at least one employee was not hired because of his age.  (Doc. No. 42, PageID #681.)  Scott also argues that Presrite failed to

hire K.B., an older but more experienced applicant for an estimator position, while hiring a younger employee.  (Doc. No. 42, PageID #673–74; Doc. No. 42-1, PageID #734.)  And Scott alleges that the termination of an employee named J.T. is evidence of age discrimination.  (Doc. No. 41-2, PageID #621.)  Scott names other employees as well.  (Doc. No. 42, PageID #681.) And, mirroring the plaintiff in *Canning*, Scott also argues that his belief was grounded in statements from other employees who told Scott that they felt they were being discriminated against.  (*Id.*)

Just as the *Canning* court did, this Court rejects Presrite's non-discriminatory explanations for each of Scott's allegations.  For instance, Presrite argues that T.B.'s termination was part of a larger layoff at Presrite due to economic conditions.  (Doc. No. 41-1, PageID #589.)  Presrite also presented evidence that K.B. did not have an engineering degree that Presrite mandated for that position, and so K.B. was not qualified while the younger candidate was.  (Doc. No. 39, PageID #572–73.)  And Presrite presented evidence that it was deciding between terminating J.T. and another employee, L.C., both of which were over the age of 40. (*Id.* at PageID #574.)  However, as the *Canning* court explained, even though Presrite provides contrary evidence as to each claim of discrimination Scott alleges, the question is not whether Presrite actually discriminated against these employees.  Instead, the question is whether Scott believed these actions violated anti-discrimination laws.  *Canning*, 2017 WL 4918521, at *5 ("it is not Plaintiff's burden to prove that age discrimination actually occurred").  Indeed, courts deny summary judgment even where a defendant "repeatedly disputes the veracity of many of the . . . allegations."  *Id.*  With the record evidence presented on summary judgment, this Court cannot decide as a matter of law that Scott's belief was unreasonable.

The standard Presrite must meet is a high one.  First, the case is before the Court on

summary judgment, where "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Kalamazoo Acquisitions*, 395 F.3d at 342.  Under the summary judgment standard, it is not the Court's role to make credibility determinations or weigh conflicting evidence.  *Payne*, 767 F.3d at 530.  Second, the standard for a reasonable belief under retaliation claims is equally high.  The Court must consider the "totality of the circumstances," "analyzed in light of the employee's training and experience," and conclude, as a matter of law, that "no reasonable person could have believed that the facts . . . amounted to a violation or otherwise justified the employee's belief that illegal conduct was occurring." *Yazdian*, 793 F.3d at 646–47.  Lastly, the Sixth Circuit has repeatedly emphasized that the "burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000)).  These mandates operate as a high bar to disposal of retaliation claims on summary judgment based on the reasonableness of a plaintiff's belief.  Here, those mandates are fatal to Presrite's arguments on summary judgment.  While Presrite may provide compelling evidence that Scott's belief was not reasonable, that evidence must be presented to a jury.

### b.    Knowledge of Protected Activity

Presrite argues that it did not have knowledge of Scott's protected activity.  (Doc. No. 41-1, PageID #601.)  A plaintiff must show that defendants "knew" or were "aware of" of the plaintiff's protected activity. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002); *Spengler*, 615 F.3d at 491–92 ("Defendant knew about his exercise of the protected activity").  Without such knowledge, a defendant cannot have retaliated against a plaintiff because of the protected activity. *Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 482 (6th Cir. 2008) ("one cannot

retaliate against an employee for engaging in protected activity unless he knew the employee had done so").  Knowledge can be shown through direct or circumstantial evidence.  *Mulhall*, 287 F.3d at 552–53.  First, Presrite claims that, because Scott did not engage in any protected activity, it could not have known of any protected activity Scott allegedly engaged in.  (Doc. No. 41-1, PageID #601.)  Second, Presrite argues that Plaintiff's "only alleged incidences of voicing clear opposition to a supervisor were when Plaintiff allegedly told Carman, May, and Vinyard that he believed M.F. was being set up to be terminated."  (*Id.*)  These allegations, Presrite argues, are so "unreasonable and unsupported" that Presrite had no reason to know that Scott engaged in protected activity.  (*Id.*)  As an initial matter, because the Court finds there is a question of fact regarding whether Scott engaged in protected activity, the Court declines to find that Presrite did not have knowledge because Scott did not actually engage in a protected activity.

Presrite's other arguments regarding knowledge are unpersuasive.  In *Mulhall*, the Sixth Circuit explained that in many cases, there will be "direct evidence that the decision making officials knew of the plaintiff's protected activity."  *Mulhall*, 287 F.3d at 552.  Yet a plaintiff can "survive summary judgment by producing circumstantial evidence to establish this element of her claim."  *Id.*  In affirming the district court's grant of summary judgment, the *Mulhall* court explained that plaintiff failed to produce evidence of direct or circumstantial knowledge.  *Id.*  Instead, all the witnesses testified that they did not know of plaintiff's protected activity when they took the adverse employment action.  *Id.*  Further, plaintiff failed to show circumstantial evidence that any of the decision-makers were aware of the protected activity.  *Id.* at 553.  For instance, the Sixth Circuit explained that plaintiff failed to produce evidence that defendants took some sort of action, independent of the adverse action, which would demonstrate knowledge.  *Id.*

Here, in stark contrast to *Mulhall* where the record was devoid of evidence of knowledge, Scott presented evidence of both direct and circumstantial knowledge sufficient to overcome Presrite's motion for summary judgment.  Scott made allegations of unlawful conduct to Vinyard on July 15, 2021 (Doc. No. 41-2, PageID #630), repeated those allegations the morning of July 16, 2021 to Carman (*id.* at PageID #634), and then further explained those allegations during a meeting the afternoon of July 16, 2021 with Davis, May, and Vinyard (Doc. No. 42, PageID #677).  Deposition testimony confirms that Scott made allegations of unlawful conduct.  (Doc. No. 42-3, PageID #759 (Carman deposition testimony discussing Scott allegations regarding "Presrite wanting to fire older, sick employees"); Doc. No. 42-4, PageID #769 (Davis deposition testimony discussing Scott's "untrue statements" including that Presrite was "planning to terminate [M.F.], and that we were participating in unlawful practices of terminating sick or elderly employees.").)  Further, Carman and Davis held an independent meeting to discuss the matter (Doc. No. 42-4, PageID #772–76, 780), followed by another independent meeting between Carman, Davis, and May (*id.* at PageID #776).   These meetings are circumstantial evidence with which a jury could infer each knew about Scott's allegations.  Afterall, Presrite would not have held these meetings unless it had knowledge of Scott's allegations.  No matter how "unreasonable" Presrite believes the allegations to be, it was sufficiently aware of Scott's protected activity to survive summary judgment.

c.      **Causal Connection Between Protected Activity and Termination**

Presrite's last challenge to Scott's *prima facie* case is that Scott has not shown a causal connection between his protected activity and his termination.  (Doc. No. 41-1, PageID #602.)  However, Presrite's argument on this issue does not address causation, but instead, whether Scott held a subjective good faith belief that Presrite engaged in unlawful conduct.  Presrite argues

Scott did not hold a good faith belief that Presrite engaged in unlawful conduct, but instead, Scott used allegations of discrimination as a "smokescreen" for the real reason for his termination. (Doc. No. 41-1, PageID #602.)  The good faith belief requirement is addressed with respect to whether a plaintiff engaged in protected activity.  The cases Presrite cites on this issue bears this out—both cases discuss whether the plaintiff held a good faith belief, and thereby engaged in protected activity.  *See Monteiro v. Poole Silver Co.*, 615 F.2d 4 (1st Cir. 1980); *Fowler v. District of Columbia*, 404 F. Supp. 2d 206 (D.D.C. 2005).  Neither case discusses causation head on.  In any event, even with respect to the good faith belief requirement, neither case is on point.[6]

In *Monteiro*, plaintiff alleged his employer terminated him on the basis of his race. *Monteiro*, 615 F.2d at 5.  During a workplace confrontation, plaintiff was told by his supervisor to return to his workstation.  *Id.* at 6–7.  Frustrated that others were permitted to walk around, plaintiff accused his supervisor of racial discrimination.  *Id.*  After some time and further argument, plaintiff's supervisor terminated his employment.  *Id.* at 7.  Plaintiff sued, alleging—in part—that he was retaliated against for reporting discrimination to his supervisor.  After a bench trial, the district court found in favor of the employer.  *Id.*  The district court found that plaintiff

---

[6] The Court construes Presrite's causation argument as one challenging whether Scott had a good faith belief of unlawful conduct, and therefore, engaged in protected activity.  To the extent Presrite challenges the causation element more generally, the Court rejects Presrite's argument. "'[A] plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action' or otherwise engaged in protected activity."  *George v. Youngstown State Univ.*, 966 F.3d 446, 459–60 (6th Cir. 2020) (quoting *Nguyen*, 229 F.3d at 563).  The Sixth Circuit has described the causation requirement at the *prima facie* stage to be "not onerous" and can be shown when "the adverse action was taken shortly after the plaintiff's exercise of protected rights."  *Id.* at 460.  In fact, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation."  *Mickey*, 516 F.3d at 525.  Here, Presrite terminated Scott immediately following his reporting of unlawful conduct.  That temporal proximity, at this stage, is sufficient.

was not credible in his version of the events and that his claim of discrimination was likely raised as a smokescreen to otherwise legitimate criticism—his work efficiency. *Id.* at 8. The First Circuit affirmed, giving great weight to the district court's factual and credibility determinations. *Id.*

*Monteiro* is inapposite on procedure. *Monteiro* was appealed following a bench trial where the district court made factual and credibility determinations. The main issue in *Monteiro* was whether the plaintiff's allegations were made in "good faith" and whether the plaintiff "conscientiously" held the belief that he was being discriminated against. The district could held that plaintiff did not, and instead raised issues of discrimination only in response to legitimate criticism for which plaintiff was ultimately fired. However, in this case at this stage, the Court cannot make the credibility determinations the *Monteiro* court could. Accordingly, the Court has no basis to conclude that Scott's allegations were made in bad faith.

*Fowler* is distinguishable on the facts. In *Fowler*, plaintiff—a schoolteacher—was reprimanded by the school principal for unprofessional conduct relating to a female student in his class. *Fowler*, 404 F. Supp. 2d at 208. Following that incident, plaintiff provided the principal with a memorandum, which included an allegation that the principal was involved in sexual harassment. *Id.* Several months later, plaintiff was fired as part of a reduction in force. *Id.* Plaintiff sued, alleging that the real reason for his termination was his reporting of the principal's sexual harassment. *Id.* at 209. Plaintiff also alleged that because of the memorandum, the principal embarked upon a retaliation campaign which included poor performance reviews leading up to his termination. *Id.* The district court granted the defendant school district's motion for summary judgment. *Id.* at 212. The court held that plaintiff's belief of unlawful conduct was neither reasonable nor held in good faith. *Id.* at 210–11. As to reasonableness, the

court held that the principal's conduct, even if true, could not have amounted to a violation of the law. *Id.* at 211. As to plaintiff's good faith belief, the court held that because plaintiff only reported the alleged sexual harassment after his own reprimand, plaintiff's reporting of the inappropriate behavior was not in good faith. *Id.* Additionally, other than the memorandum, plaintiff engaged in no other opposition activity. *Id.* Together, the court could not find that plaintiff held a good faith belief, and instead, weaponized the retaliation laws to protest his own termination. *Id.*

Here, unlike *Fowler*, while Scott did have discussions with Vinyard about Scott's job performance prior to his reporting of any alleged unlawful conduct, Vinyard herself testified that Scott's job was not in jeopardy prior to July 16, 2021. (Doc. No. 42-5, PageID #807.) Further, Scott testified that his concerns regarding Presrite's conduct had been growing since 2019 and included statements from other employees regarding Presrite's actions. (Doc. No. 42, PageID #672–73; Doc. No. 41-2, PageID #636.) In short, at a minimum, there is an issue of fact for the jury to resolve regarding whether Scott held a good faith belief that Presrite engaged in unlawful conduct. This is not a case, like in *Fowler*, where the protected activity was in specific response to a reprimand.

### 2.     Legitimate, Non-Discriminatory Reason

Once a plaintiff has shown a *prima facie* case of retaliation, the burden shifts to the defendant "to proffer a legitimate, nondiscriminatory reason" for the termination. *Jackson*, 999 F.3d at 350; *Spengler*, 615 F.3d at 492 (a defendant must "articulate some legitimate, nondiscriminatory reason for its action"). Here, Presrite's proffered non-discriminatory reason is that Scott was "being dishonest about the information of [M.F.] to executive management, that

we lost faith in his trust and leadership."[7]  (Doc. No. 42, PageID #682; Doc. No. 41-1, PageID #603.)  That is, Presrite claims that Scott lied to Carman when they spoke regarding M.F.'s alleged potential termination.  (Doc. No. 41-1, PageID #596.)  In this Circuit, "an employee's insubordination and her failure to follow company policies constitute legitimate, nonretaliatory reasons to terminate employment."  *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 252 (6th Cir. 2023) (collecting cases).  In his summary judgment briefing, Scott does not provide argument that this reason was not a legitimate, non-discriminatory reason for his termination.  As such, for purposes of summary judgment, and consistent with *Goldblum*, the Court finds that Presrite's proffered reason is legitimate and non-discriminatory.

### 3.    Pretext

If a defendant can proffer a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to show the proffered reason was a pretext.  *Jackson*, 999 F.3d at 350.  "A plaintiff can rebut an employer's legitimate, nondiscriminatory reason and show pretext by demonstrating that: '(1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action.'"  *Spengler*, 615 F.3d at 493 (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008)).  The Sixth Circuit has called this assessment a "commonsense inquiry," requiring a court to determine whether "the employer fire[d] the employee for the stated reason or not?"  *Jackson*, 999 F.3d at 350 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

---

[7] Presrite alludes to the other conduct at issue in July 2021 throughout its brief.  That conduct suggests that Scott might have been at risk for termination for other reasons.  However, in this case, Presrite states that it terminated Scott because of his dishonest behavior in reporting the alleged discriminatory conduct.  (Doc. No. 41-1, PageID #603.)

As elsewhere, "[t]he plaintiff's 'burden is not heavy,' and 'summary judgment is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual.'"  *Id.* (citing *George*, 966 F.3d at 462).

Scott argues that he spoke to Presrite and his superiors about his belief that Presrite was discriminating against employees due to their age or disability, and that up until the night before Davis learned of these allegations (July 15, 2021), Scott was not in danger of losing his job. (Doc. No. 42, PageID #682–83.)  According to Scott, these facts are sufficient to show that the stated reason for his termination is pretextual.  (*Id.*)  Presumably, Scott is arguing that since he was not at risk of termination on July 15, 2021, and the decision to terminate him occurred on July 16, 2021, the only reason he could have been terminated was because Davis and others found out about his allegations of discriminatory conduct.  Presrite argues that Scott cannot prove he was terminated for anything other than his "dishonesty" and "erratic behavior."  (Doc. No. 41-1, PageID #604.)

At the summary judgment stage, the Court determines that there is a genuine issue of material fact regarding whether Presrite's claimed reason for terminating Scott was a pretext for retaliation.  Specifically, the Court cannot determine as a matter of law on the record before it whether Scott was terminated for his "dishonest" behavior or whether he was terminated for reporting discrimination to his superiors.  This determination would require the Court to conduct credibility determinations because it would require the Court to determine whether Scott made up a lie about M.F. and falsely reported it to his superiors.  The Court would further have to determine that it was the lie regarding M.F. that caused Scott's termination, and not the allegations of discrimination more generally.  In a case not so factually dissimilar to the instant one, a district court in this Circuit found that where an employee is terminated on the premise of

dishonesty with respect to filing false reports of discrimination, summary judgment is not warranted because it would require a court to make credibility determinations regarding the truth of the underlying conduct. *EEOC v. HP Pelzer Auto. Sys., Inc.*, No. 17-cv-31, 2018 WL 3723708, *7–8 (E.D. Tenn. Aug. 3, 2018) (denying summary judgment on retaliation claim where defendant argued that it terminated plaintiff for filing a false report of sexual harassment because there was a genuine issue of material fact to be resolved by the jury regarding whether plaintiff actually lied).

Here, an analysis of whether Scott lied would require the Court to conduct credibility determinations. Scott has met his burden on showing that the reason offered for terminating him—his dishonest behavior—was not the actual reason for his termination. In sum, Scott has showed a *prima facie* case of discrimination. While Presrite has provided a legitimate, non-discriminatory reason for Scott's termination, the Court cannot determine whether that proffered reason was a pretext for Scott's termination as a matter of law.

## C. The Aiding and Abetting Violations of Analogous Ohio Law

Count IV of the complaint asserts an aiding and abetting claim against Davis, May, Vinyard, and Carman in violation of R.C. 4112.02(J). Davis, May, Vineyard, and Carman argue that because Scott's retaliation claims fail, so too must the aiding and abetting claims. R.C. 4112.02(J) makes it unlawful for "any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice . . . or to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice." Under this statute, individual employees can be liable for aiding and abetting an employer's retaliatory practice in violation of R.C. 4112.02(I). *Hauser v. Dayton Police Dep't*, 17 N.E.3d 554, 558 (Ohio 2014) (finding R.C. § 4112.02(J) "holds individual employees liable

for their participation in discriminatory practices.").  To be liable, an employee must have been "involved in or actually made the decision to retaliate." *Cummings v. Greater Cleveland Reg'l Trans. Auth.*, 88 F. Supp. 3d 812, 820 (N.D. Ohio 2015).  Claims arising under R.C. 4112.02(J) generally rise and fall with the underlying claim of retaliation.  *Siwik v. Cleveland Clinic Found.*, No. 17-cv-1063, 2019 WL 1040861, at *28 (N.D. Ohio Mar. 5, 2019) (denying summary judgment on aiding and abetting claim under R.C. 4112.02(J) because there existed a genuine issue of material facts as to plaintiff's underlying retaliation claims).  In other words, if the underlying claim of retaliation cannot stand, neither can the aiding and abetting claim, and vice versa.

Here, as discussed above, Scott's retaliation claim survives Presrite's motion for summary judgment.  Because Scott has a viable retaliation claim, Davis's, May's, Vinyard's, and Carman's argument fails.  Further, evidence shows that Davis, May, Vinyard, and Carman were involved in the decision to terminate Scott.  After the July 16, 2021 meeting with Scott, May and Vinyard both testified that Davis stated Scott should be terminated and they agreed.  (Doc. No. 42-2, PageID #752; Doc. No. 42-5, PageID #814.)  Carman similarly testified that Davis informed him of the situation with Scott and that Carman agreed to his termination.  (Doc. No. 42-3, PageID #759.)

For these reasons, the Court denies Davis', May's, Vinyard's, and Carman's motion for summary judgment on Count IV.

### D.    Wrongful Discharge Under Ohio Public Policy

In Count V, Scott asserts a wrongful discharge claim alleging that Presrite terminated him because he retained or sought legal counsel.  Ohio is an at-will employment state.  *Mers v. Dispatch Printing Co.*, 483 N.E.2d 150, 153 (Ohio 1985).  Accordingly, when an employee does

not have an employment contract, an employer can terminate the employee for any reason or no reason at all, so long as the termination is not contrary to law.  *Id.*  There are a few exceptions to this general rule.  One such exception is when the termination is against clear public policy.  *Painter v. Graley*, 639 N.E.2d 51, 56 (Ohio 1994).  There is "no question that it is against the clear public policy of the state of Ohio for an employer to terminate an employee for retaining legal counsel."  *Kulick v. Ethicon Endo-Surgery, Inc.*, 803 F. Supp. 2d 781, 788–89 (S.D. Ohio 2011) (citing *Simonelli v. Anderson Concrete Co.*, 650 N.E.2d 488, 492 (Ohio Ct. App. 1994)).  The Ohio Supreme Court explained the elements of a public policy wrongful discharge claim:

> (1) That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Dohme v. Eurand Am., Inc.*, 956 N.E.2d 825, 829 (Ohio 2011) (cleaned up).

Presrite argues that it is entitled to summary judgment on this claim because there are no facts demonstrating that Presrite terminated Scott because he retained an attorney.  (Doc. No. 41-1, PageID #607–08.)  Presrite argues that the decision to terminate Scott occurred before the July 16, 2021 meeting, and therefore, even if Presrite knew Scott retained an attorney, it could not have caused his termination.  (Doc. No. 39, PageID #574.)  Further, Presrite argues that no one at Presrite knew Scott retained an attorney.  (Doc. No. 41-1, PageID #608.)  Without such knowledge, Scott's termination could not be related to his retention of an attorney.  (*Id.*)  For his part, Scott claims that during the July 16, 2021 meeting between himself, May, and Vinyard, he told them that he had spoken with an attorney and knew his rights.  (Doc. No. 42, PageID #684.)  Immediately after that meeting, Presrite decided to terminate Scott.  (*Id.*)

Presrite's argument that it made the decision to terminate Scott before the July 16, 2021 meeting is not sufficiently clear based on the record evidence.  Presrite argues that it made the decision to terminate Scott prior to the July 16, 2021 meeting where Scott allegedly told May and Vinyard he retained legal counsel.  (Doc. No. 41-1, PageID #608.)  However, that argument is not supported by undisputed record evidence.  Davis testified that he decided to terminate Scott prior to the July 16, 2021 meeting.  (Doc. No. 42-4, PageID #782.)  But Davis later testified that a "final decision" was not made until after the July 16, 2021 meeting between Scott, May, and Vinyard.  (*Id.* at PageID #797.)  And May testified that the decision to terminate Scott occurred after the July 16, 2021 meeting between himself, Vinyard, and Scott.  (Doc. No. 42-2, PageID #752.)  While Scott testified that he believed Presrite made the decision to terminate him before the July 16, 2021 meeting (Doc. No. 39, Page ID #574–75), Scott could not know that with certainty—that was simply his belief.  With the conflicting evidence on this issue, on a motion for summary judgment, the Court cannot dismiss this claim because there is disputed evidence relating to when Presrite made the decision to terminate Scott.

Similarly, Presrite's argument that it did not know Scott retained an attorney fails at the summary judgment stage because there are material facts in dispute regarding whether Presrite knew Scott retained an attorney.  Ohio law requires a plaintiff alleging wrongful termination based on obtaining legal counsel to show that the employer "was motivated by" the employee seeking or obtaining counsel.  *Dohme*, 956 N.E.2d at 829.  Thus, Scott's claim can only proceed if he can show that Presrite knew he retained counsel.  If Presrite did not know, then it could not have terminated him because he retained counsel.  Scott claims that he told May and Vinyard during the July 16, 2021 meeting that he retained counsel.  (Doc. No. 42, PageID #684.)  However, May testified that he did not hear Scott's claim.  (Doc.  No. 41-1, PageID #608.)  On a

motion for summary judgment, the Court cannot resolve this issue because it is disputed by both parties.  Instead, it will be up to the fact finder to determine whether Scott genuinely did tell Presrite he retained an attorney and whether Presrite genuinely did not hear Scott's statement.

Construing the facts in the light most favorable to Scott, considering Scott's allegations and the timing of his termination, the Court cannot conclude as a matter of law that Presrite was not motivated by Scott's retention of legal counsel.

## IV.  <u>Conclusion</u>

For the reasons stated above, Defendants' motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

**Date**:  June 26, 2024

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE